# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

THE LOUIS D. BRANDEIS CENTER
FOR HUMAN RIGHTS UNDER LAW
and JEWISH AMERICANS FOR
FAIRNESS IN EDUCATION,

        Plaintiffs,

v.

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE,

        Defendant.

Case No. 1:24-cv-11354-RGS

# MEMORANDUM OF LAW IN SUPPORT OF
# <u>DEFENDANT'S MOTION TO DISMISS</u>

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ..................................................................................................................2

STANDARD OF REVIEW ...................................................................................................5

ARGUMENT .......................................................................................................................6

I.     Plaintiffs Lack Standing..............................................................................................6

     A.     The Brandeis Center Lacks Organizational Standing .................................................6

     B.     Plaintiffs Lack Associational Standing To Sue For Their Members .......................7

          1.     Plaintiffs' claims require individualized participation of their members ....8

          2.     Plaintiffs' members lack standing for injunctive relief............................8

II.    Plaintiffs Fail To State A Title VI Claim...................................................................10

     A.     Plaintiffs Do Not Plausibly Allege Direct Discrimination ....................................10

     B.     Plaintiffs Do Not Plausibly Allege Harvard's Liability For A Hostile
          Educational Environment..................................................................................12

     C.     Plaintiffs Do Not Plausibly Allege Retaliation......................................................18

CONCLUSION....................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Alexander v. Sandoval*,
532 U.S. 275 (2001)................................................................................10, 12

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024)................................................................................6, 7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................5, 19

*Aulson v. Blanchard*,
83 F.3d 1 (1st Cir. 1996)................................................................................5

*Barnett v. Johnson City School District*,
2005 WL 8178066 (N.D.N.Y. Feb. 2, 2005)................................................8

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................5

*Bose v. Bea*,
947 F.3d 983 (6th Cir. 2020)................................................................19

*Burlington Northern & Santa Fe Railway Co. v. White*,
548 U.S. 53 (2006)................................................................................18

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)................................................................................9

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2013)................................................................................8, 9

*Cornelius-Millan v. Caribbean University, Inc.*,
2015 WL 1860831 (D.P.R. Apr. 23, 2015)................................................18

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*,
958 F.3d 38 (1st Cir. 2020)................................................................9

*Davis v. Monroe County Board of Education*,
526 U.S. 629 (1999)................................................................11, 12, 13, 16

*Doe v. Amherst College*,
238 F. Supp. 3d 195 (D. Mass. 2017)................................................12

*Doe v. Brown University*,
    43 F.4th 195 (1st Cir. 2022).................................................................11, 12

*Doe v. Emerson College*,
    271 F. Supp. 3d 337 (D. Mass. 2017)........................................13, 15, 17

*Doe v. Pawtucket School Department*,
    969 F.3d 1 (1st Cir. 2020)..............................................................................14

*El Paso County, Texas v. Trump*,
    982 F.3d 332 (5th Cir. 2020) ........................................................................7

*Equal Means Equal v. Ferriero*,
    3 F.4th 24 (1st Cir. 2021)..............................................................................6

*Felber v. Yudof*,
    851 F. Supp. 2d 1182 (N.D. Cal. 2011) ..................................................17

*Fitzgerald v. Barnstable School Committee*,
    504 F.3d 165 (1st Cir. 2007)..........................................13, 15, 16, 17

*Frazier v. Fairhaven School Committee*,
    276 F.3d 52 (1st Cir. 2002)..........................................................................18

*Friends of the Earth v. Sanderson Farms, Inc.*,
    992 F.3d 939 (9th Cir. 2021) ......................................................................7

*Gebser v. Lago Vista Independent School District*,
    524 U.S. 274 (1998).................................................................................11, 13

*Germanowski v. Harris*,
    854 F.3d 68 (1st Cir. 2017).................................................................18, 19

*Gonzalez v. United States*,
    284 F.3d 281 (1st Cir. 2002).........................................................................5

*Hunt v. Washington State Apple Advertising Commission*,
    432 U.S. 333 (1977).........................................................................................8

*Ingram v. Kubik*,
    30 F.4th 1241 (11th Cir. 2022) ..........................................................11, 19

*Johansen v. United States*,
    506 F.3d 65 (1st Cir. 2007).........................................................................5

*Jones v. City of Detroit*,
    20 F.4th 1117 (6th Cir. 2021) ...................................................................11

*Justiniano v. Walker*,
    986 F.3d 11 (1st Cir. 2021)..................................................................................5

*Lebron v. Commonwealth of Puerto Rico*,
    770 F.3d 25 (1st Cir. 2014)................................................................................20

*National Association of Government Employees v. Mulligan*,
    914 F. Supp. 2d 10 (D. Mass. 2012)....................................................................8

*Parent/Professional Advocacy League v. City of Springfield*,
    934 F.3d 13 (1st Cir. 2019)..................................................................................8

*Porto v. Town of Tewksbury*,
    488 F.3d 67 (1st Cir. 2007)................................................................................13

*Roe v. Healey*,
    78 F.4th 11 (1st Cir. 2023)..................................................................................9

## STATUTES AND RULES

42 U.S.C. § 2000d........................................1, 8, 10, 11, 12, 13, 15, 16, 17, 18, 19, 20

Fed. R. Civ. P. 12(b)(1)...............................................................................................1, 5

Fed. R. Civ. P. 12(b)(6)...............................................................................................2, 5

## OTHER AUTHORITIES

Jo B. Lemann et al., *Harvard Law School Student Charged With Assaulting
    Student In Homophobic Attack*, Harv. Crimson (Feb. 9, 2023),
    https://www.thecrimson.com/article/2023/2/9/harvard-law-homophobic-
    attack/ ................................................................................................................12

Catherine E. Lhamon, Assistant Secretary for Civil Rights, U.S. Department of
    Education, Dear Colleague Letter (May 7, 2024),
    https://www2.ed.gov/about/offices/list/ocr/letters/colleague-202405-shared-
    ancestry.pdf .......................................................................................................17

## INTRODUCTION

Harvard condemns antisemitism, as it does all forms of discrimination based on race, national origin, or shared ancestry.  Conduct that targets Harvard's Jewish students, faculty, or staff for discrimination or harassment is not just unacceptable but antithetical to Harvard's foundational values.  Harvard therefore has taken, and is continuing to take, concrete steps to protect its Jewish students, vindicate their right to pursue their education free from harassment and discrimination, and make clear that the scourge of antisemitism has no place at Harvard.

Plaintiffs claim that Harvard not only has fallen short in these efforts, but it has intentionally discriminated against five unnamed Jewish and Israeli students.  Jurisdictional defects doom these claims.  And even if they did not, Plaintiffs do not come close to plausibly alleging that Harvard has intentionally discriminated against any of their members.  Their Complaint focuses almost exclusively on two incidents to which they concede Harvard is responding—just not to their satisfaction.  The Complaint should be dismissed with prejudice.

The Court should dismiss under Rule 12(b)(1) because Plaintiffs lack standing.  The Louis D. Brandeis Center ("Brandeis Center") claims a direct injury but does not plead facts establishing its organizational standing to sue.  Its allegations that the organization has diverted resources in response to Harvard's conduct fail as a matter of law, because they raise at most the inference that the Brandeis Center has continued spending money on its charter activities supporting members and engaging in education and advocacy.  And neither the Brandeis Center nor Jewish Americans for Fairness in Education ("JAFE") can establish associational standing to sue on behalf of their members, because the claims they bring require their members' individualized participation.  Even if Plaintiffs could sue for their members, those members would lack standing to seek prospective injunctive relief—the only form of relief sought here— because they do not plead an ongoing or certainly impending injury traceable to Harvard.

1

Dismissal also is warranted under Rule 12(b)(6) because Plaintiffs fail to state a Title VI claim. Their direct discrimination claim fails because Plaintiffs cannot plausibly allege that Harvard can be held vicariously liable under Title VI for alleged disparate treatment by a professor, especially in light of the actions Plaintiffs concede Harvard took in response. Nor can this Court infer from the Complaint that while Harvard disciplines other forms of bias, it does not do so with respect to antisemitic conduct. Plaintiffs' hostile environment claims fail as well because their own allegations refute any claim that Harvard has refused to respond appropriately to alleged harassment—let alone acted with deliberate indifference. And Plaintiffs' retaliation allegations raise no plausible claim that Harvard took any action against their members, let alone did so because of a complaint about discrimination.

## BACKGROUND

Plaintiffs are two organizations that claim to share overlapping members, some of whom are students at Harvard. *See* Compl. ¶¶ 18, 20-25. The Brandeis Center is a nonprofit that "engages in research, education, and legal advocacy to combat antisemitism on college and university campuses," "empowers students by training them to understand their legal rights," and "educates administrators and employers on best practices to combat racism and antisemitism." *Id.* ¶ 18. JAFE is "a national membership organization that is housed within and operated by the Brandeis Center." *Id.* ¶ 20. "[M]embers of JAFE also become members of the Brandeis Center." *Id.* Plaintiffs allege five unnamed members experienced discrimination. *Id.* ¶¶ 21-25.

Members 1-3 (the "HKS Members") are Harvard Kennedy School students who claim they faced discrimination during a two-week class taught by Professor Marshall Ganz in Spring 2023. *See* Compl. ¶¶ 3, 37-38. As part of the class, they sought to make a presentation "about Jewish democracy in Israel," but Professor Ganz did not let them present on their chosen topic. *See id.* ¶¶ 39-51. Instead, Professor Ganz expressed concerns that their topic was "highly

controversial" and "provocative." *Id.* ¶¶ 47, 49.  The HKS Members claim they received "lower grades than they deserved" from Professor Ganz due to their choice of topic. *Id.* ¶ 60.  They also allege Professor Ganz allowed his teaching fellows to lead a class exercise that "subjected the HKS Members to a litany of aggressively anti-Israeli diatribes" by classmates. *Id.* ¶¶ 52-55.  The HKS Members asked for "an opportunity to respond" but were denied. *Id.* ¶¶ 56-57.

The Brandeis Center sent a letter to Harvard's then-President and then-Kennedy School Dean Douglas Elmendorf on March 29, 2023, describing the experiences of the HKS Members in Professor Ganz's class.  Compl. ¶ 65.  Harvard "commissioned an external investigator to evaluate HKS Members' claims," who issued an investigative report two months later. *Id.* ¶ 66. The report, which Plaintiffs attach to the Complaint, found that Professor Ganz treated the HKS Members differently "on the basis of their Israeli national origin and Jewish ethnicity and ancestry." *Id.* ¶ 67; *see id.* Ex. A at 21.  Dean Elmendorf notified them one day after receiving this report that "he had accepted a majority of the [report's] findings of facts and conclusions," *id.* ¶ 75, and a few months later, "advised HKS Members that Harvard was taking 'certain personnel actions' that could not be disclosed and 'organizing sessions for all faculty members regarding difficult conversations in class among students with different perspectives.'" *Id.* ¶ 79. In response to a follow-up letter, Harvard informed Plaintiffs that Harvard "has undertaken a number of … measures" in response to the issues raised, including measures Harvard "is not permitted to disclose under its personnel policies." *Id.* ¶¶ 139, 142.

Members 4 and 5 claim they experienced discrimination following the October 7, 2023, Hamas attack on Israel.  Member 4 is a Harvard Business School student who alleges he was "assaulted and bullied by a mob of anti-Israel protestors at Harvard" on October 18.  Compl. ¶ 111.  Member 4 alleges that, while he was walking through and filming a demonstration

outside of the Business School, a Divinity School student and a Law School student began to accost him by shouting at him to "get out." *Id.* ¶ 112-113, 117. Protestors "surrounded him with keffiyehs" and "grabbed him," telling him to "exit." *Id.* ¶¶ 120-122. The protestors allegedly "forc[ed] [him] to the outside perimeter" of the protest, "physically push[ed] him back away from the protest," and yelled "Shame!" in his face. *Id.* ¶¶ 123-125. In the following weeks, a few students and a clinical instructor posted statements about Member 4 on social media that he alleges are false. *Id.* ¶¶ 126-132. Harvard announced, on November 9, 2023, that this incident was "being investigated by the FBI and the Harvard University Police Department," and that "once law enforcement's inquiry is complete," Harvard would "address the incident through its student disciplinary procedures." *Id.* ¶ 148. Member 4 then filed complaints with the Law School and the Divinity School. *Id.* ¶¶ 144-145. Harvard retained outside counsel to investigate the incident; counsel met with Member 4's attorneys in January 2024, and the investigation remains ongoing. *Id.* ¶¶ 151-159. On May 9, two individuals were charged by Suffolk County with misdemeanor assault and battery, and for violating Member 4's civil rights. *Id.* ¶¶ 157, 159.

Member 5 is a visiting doctoral student at Harvard Medical School. Compl. ¶ 25. She alleges that, since October 7, 2023, she has witnessed protests with pro-Hamas celebrations and chants that she found offensive. *Id.* ¶¶ 134-135. Member 5 also alleges she "has seen numerous antisemitic, anti-Israel posts" by Harvard affiliates on social media. *Id.* ¶ 136. Member 5 has attended on-campus events to show support for Israeli hostages, where she was approached and shouted at by Harvard students. *Id.* ¶ 137. Member 5 alleges that she "has emailed Harvard administrators on numerous occasions" to ask for help and request "meaningful changes on campus to create a safer environment for Jewish students." *Id.* ¶ 162. She considered filing a

complaint "based on antisemitic and anti-Israel online posts" but decided against it after learning that Harvard's formal complaint process requires complainants to identify themselves. *Id.*

Beyond the responses Plaintiffs describe, *e.g.*, Compl. ¶ 148, 151-159, Harvard has taken, and continues to take, action to combat the rise in antisemitism that has roiled campuses nationwide. Harvard has increased on-campus security; published and adhered to clear policies governing on-campus events; bolstered resources for students making complaints; worked with social media platform Sidechat to address antisemitic posts; cleared the protest encampment in Harvard Yard; standardized the fact-finding processes for disciplinary cases that affect multiple schools; enforced its policies through disciplinary action where appropriate; and convened the Task Force on Combating Antisemitism, which has delivered preliminary recommendations for a path forward. Decl. of Meredith Weenick ¶¶ 3-7; Decl. of Felicia Ellsworth Exs. 1-13.

## STANDARD OF REVIEW

When a defendant moves to dismiss under Rule 12(b)(1), "'the party invoking the jurisdiction of a federal court carries the burden of proving its existence.'" *Johansen v. United States*, 506 F.3d 65, 68 (1st Cir. 2007). The Court may then "consider materials outside the pleadings," such as declarations, "'in order to determine jurisdiction.'" *Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir. 2002). To avoid dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If the Court cannot "infer from the well-pleaded facts 'more than the mere possibility of misconduct,' then the complaint has not shown 'that the pleader is entitled to relief.'" *Justiniano v. Walker*, 986 F.3d 11, 19 (1st Cir. 2021). The Court need not credit a "'legal conclusion couched as a factual allegation.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Nor must it accept "bald assertions" or "unsupportable conclusions." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996).

## ARGUMENT

### I.   PLAINTIFFS LACK STANDING

#### A.   The Brandeis Center Lacks Organizational Standing

Only the Brandeis Center asserts that it has suffered injury as an organization, but it cannot establish a cognizable injury based on allegations that it "has expended considerable resources in responding to" Harvard's handling of antisemitism on campus or that its "attorneys and staff have been diverted from other work while dealing with" Harvard's response.  Compl. ¶ 19.  An organizational injury is one that "'perceptibly impaired'" the organization's "'core business activities,'" *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)), "such that it 'had to devote significant resources to identify and counteract' that conduct," *Equal Means Equal v. Ferriero*, 3 F.4th 24, 30 (1st Cir. 2021) (quoting *Havens*, 455 U.S. at 379).  No such injury is pleaded here.

The theory behind the Brandeis Center's asserted injury—that "standing exists when an organization diverts its resources in response to a defendant's actions"—"is incorrect."  *Alliance for Hippocratic Med.*, 602 U.S. at 395.  "[A]n organization may not establish standing simply based on the 'intensity of the litigant's interest'" or "by expending money to gather information and advocate against the defendant's action." *Id.* at 369-370.  Nor can an organization establish standing based on costs incurred "to educate and inform [its] members, supporters and the general public." *Equal Means Equal*, 3 F.4th at 30.  The Brandeis Center asserts it has spent resources "counseling aggrieved students, raising public awareness of the Defendant's conduct in an effort to seek compliance by the Defendant, and filing complaints with the Defendant regarding the discrimination and hostile environment that [its] members have experienced." Compl. ¶ 19.  But similar allegations did not suffice to confer standing in *Alliance for Hippocratic Medicine*, where an organization "expend[ed] considerable time, energy, and

resources drafting … petitions … as well as engaging in public advocacy and public [and member] education," "to the detriment of other spending priorities."  602 U.S. at 394.

The specific actions the Brandeis Center alleges it has taken in response to Harvard's alleged conduct also fail to establish, as they must, that its "core business activities" have been "perceptibly impaired."  *Alliance for Hippocratic Med.*, 602 U.S. at 395.  Harvard cannot have impaired the Brandeis Center's core business activities by requiring it to spend money "counseling aggrieved students," "raising public awareness," or "filing complaints" regarding Harvard's response to antisemitism because those activities *are* the Brandeis Center's core business activities.  The Brandeis Center's self-proclaimed mission is to "engage[] in research, education, and legal advocacy to combat antisemitism on college and university campuses" and "empower[] students by training them to understand their legal rights."  Compl. ¶ 18.  Counseling, raising public awareness, and filing complaints related to antisemitism on campus therefore is "business as usual" for the Brandeis Center and cannot produce an organizational injury.  *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 943-945 (9th Cir. 2021); *see also El Paso Cnty., Tex. v. Trump*, 982 F.3d 332, 344 (5th Cir. 2020) (an "organization's reaction to the allegedly unlawful conduct must differ from its routine activities").[1]

### B.    Plaintiffs Lack Associational Standing To Sue For Their Members

Plaintiffs also lack associational standing to sue on behalf of their members.  To establish associational standing, each Plaintiff must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the

---

[1] The Brandeis Center also fails to plausibly allege that it faces a certainly impending organizational injury that perceptibly impairs its core business activities and that is traceable to Harvard, for the same reasons its members fail to plead such an injury. *See infra* Section I.B.2.

participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Plaintiffs fail both the first and third of these requirements: their Title VI claims require the participation of individual members in the lawsuit, and their members lack standing to sue in their own right for prospective injunctive relief.  *Id.*

     1.   <u>Plaintiffs' claims require individualized participation of their members</u>

Plaintiffs lack standing to seek injunctive relief for their members because the "adjudication of the claims … would turn on facts specific to each student" and "would thus require participation and cooperation" by the students themselves.  *Parent/Professional Advoc. League v. City of Springfield*, 934 F.3d 13, 35 (1st Cir. 2019).  Plaintiffs assert that, as a result of different incidents, a handful of specific members have experienced direct discrimination, a hostile environment, and/or retaliation.  None of these claims can be resolved "without individualized consideration" of each member's personal experiences, *National Ass'n of Gov't Emps. v. Mulligan*, 914 F. Supp. 2d 10, 14 (D. Mass. 2012), including evidence that the member was denied an educational benefit, subjectively perceived a hostile educational environment, engaged in protected activity, and suffered a materially adverse action.  The claims instead rest on "the application of law to a series of different factual scenarios" and depend on "'the particularized circumstances of each individual member,'" *id.*, meaning they cannot "be prosecuted without the participation of the individual members," *Barnett v. Johnson City Sch. Dist.*, 2005 WL 8178066, at *5 n.6 (N.D.N.Y. Feb. 2, 2005).

     2.   <u>Plaintiffs' members lack standing for injunctive relief</u>

Plaintiffs also lack associational standing under *Hunt* because their members cannot establish standing to seek injunctive relief in their own right.  432 U.S. at 343.  The Complaint does not demonstrate that Plaintiffs' members face an ongoing or "certainly impending" future injury traceable to Harvard.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Allegations of "past harm" on their own "cannot support standing to seek an injunction against *future* harm." *Roe v. Healey*, 78 F.4th 11, 21 (1st Cir. 2023) (emphasis added). Merely describing an event that occurred in the past does not help Plaintiffs plead an entitlement to an injunction because it does not show "a sufficient likelihood that [their members] will again be wronged in a similar way." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Plaintiffs instead must plead their members will suffer a "future injury" that is "*certainly impending*." *Clapper*, 568 U.S. at 410 (emphasis added) (rejecting standard of "objectively reasonable likelihood").

Plaintiffs have not done so, as the Complaint consists entirely of allegations of past harm. Many involve statements that were made, or discrete incidents that took place, in a Spring 2023 class; in the immediate aftermath of October 7; or at protests in October 2023. Compl. ¶¶ 37-80, 82-93, 111- 132, 134. The only incidents even alleged to have occurred this calendar year involve a social media post that the University broadly condemned, *id.* ¶ 102; a planned campus event that was later canceled, *id.* ¶¶ 103-105; and a student-body resolution critical of Israel, *id.* ¶¶ 106-107. Plaintiffs' remaining allegations are that at unspecified times, unnamed students saw anonymous antisemitic messages on social network Sidechat and Member 5 observed protest activity and social media posts she views as offensive. *Id.* ¶¶ 93-101, 134-137.

These allegations do not plead ongoing or certainly impending injury—certainly none traceable to Harvard. Traceability requires a "sufficiently direct causal connection between the challenged action and the identified harm." *Dantzler, Inc. v. Empresas Berrios Inventory & Ops., Inc.*, 958 F.3d 38, 47 (1st Cir. 2020). But Plaintiffs cannot establish any such connection between Harvard's response to the incidents they identify and any possible ongoing or future harm. Their own allegations describe how, in response to complaints about Professor Ganz,

Harvard immediately launched an investigation, accepted its findings, and took action in response.  Compl. ¶¶ 65-66, 75, 79, 142; *id.* Exs. D, F, H.  Plaintiffs notably have not pleaded any facts supporting a conclusion that the harms their members alleged in March 2023 will or even could recur.  Similarly, Plaintiffs allege that, after allowing the law-enforcement investigation into the assault at the October 18 protest to proceed, Harvard "initiated an external investigation."  *Id.* ¶ 148; *see id.* ¶ 151-154.  Nearly all of their additional allegations describing offensive statements on social media, at protests, or by student groups lack information about when they occurred or whether any of Plaintiffs' members experienced them.  But in any case, the actions that Harvard continues to take to deter and prevent antisemitic harassment make clear that there is no plausible causal connection between Harvard's conduct and ongoing or future injury.  These actions include increased security, publication of new guidelines on campus protests, Task Force recommendations, and disciplinary actions.  Weenick Decl. ¶¶ 3-7; Ellsworth Decl. Exs. 1-13.

## II.   PLAINTIFFS FAIL TO STATE A TITLE VI CLAIM

Plaintiffs in private Title VI suits must plead "intentional discrimination."  *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).  The Complaint should be dismissed because it fails plausibly to allege that Harvard intentionally discriminated against Plaintiffs' members through direct discrimination, a hostile work environment, or retaliation.

### A.   Plaintiffs Do Not Plausibly Allege Direct Discrimination

Plaintiffs claim that Harvard directly discriminated against their members because some members allegedly experienced "intentional hostile acts" in Professor Ganz's class and because Harvard allegedly treated their members differently from similarly situated non-Jewish, non-Israeli classmates.  *See* Compl. ¶¶ 215-218.  Both theories fail.

*First*, Title VI does not permit liability in private suits "based solely on principles of *respondeat superior*." *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 283 (1998). Such "[v]icarious liability is unavailable under Title VI." *Ingram v. Kubik*, 30 F.4th 1241, 1258 (11th Cir. 2022); *accord Jones v. City of Detroit*, 20 F.4th 1117, 1121 (6th Cir. 2021). To violate Title VI, a school's response instead "must amount to deliberate indifference to discrimination." *Gebser*, 524 U.S. at 290; *see also Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640-641 (1999). Plaintiffs appear to recognize as much, asserting that Harvard "acted with deliberate indifference" toward its members rather than "adequately address" the alleged discrimination. *See* Compl. ¶ 221. But Plaintiffs' own allegations highlight that Harvard took swift corrective actions in response to complaints about Professor Ganz. *See infra* pp.13-16.

*Second*, Plaintiffs' conclusory assertions of a double standard find no support in their allegations. "For comparator proof to raise a red flag … the two 'incidents' circumstances must be reasonably comparable' and 'the nature of the infraction and knowledge of the evidence by college officials need be sufficiently similar to support a finding of facial inconsistency.'" *Doe v. Brown Univ.*, 43 F.4th 195, 207 (1st Cir. 2022). Plaintiffs nowhere present two "reasonably comparable" incidents and explain how they demonstrate animus toward Jewish or Israeli students in light of "the nature of the infraction" or Harvard's "knowledge of the evidence."

Plaintiffs base their claimed double standard almost entirely on their assertion that Harvard "fabricat[ed]" a "new 'standard practice' for addressing Member #4's assault" by "await[ing] the criminal process before initiating the University disciplinary process." Compl. ¶ 217. In support, Plaintiffs cite a single news article for the proposition that Harvard has acted differently "in response to other incidents of violence" in the past. *Id.* ¶ 149. Nothing in the Complaint or the news report indicates that Harvard initiated disciplinary proceedings before the

11

police investigation concluded in one case but not the other, or even suggests that these events involved comparable facts or similar evidence of policy violations.  The news report Plaintiffs point to only describes an accused assailant who was criminally charged and arraigned just four days after a January 2023 attack, and states that a University spokesperson "declined to comment on [the student's] current status at the school, citing privacy laws."  *See* Lemann et al., *Harvard Law School Student Charged With Assaulting Student In Homophobic Attack*, Harv. Crimson (Feb. 9, 2023) (cited in Compl. ¶ 149).  By contrast, Plaintiffs allege Member 4 was assaulted in October 2023 by individuals who were not criminally charged until May 2024, and that Harvard in any case launched an investigation as early as January 2024.  Compl. ¶¶ 151, 159.

Plaintiffs' remaining double-standard allegations consist of one paragraph listing a few incidents in which Harvard reportedly canceled events or sanctioned student groups "for taking positions that do not fit the school's political orthodoxy."  Compl. ¶ 164.  These scattered allegations come nowhere close to raising an inference of "orthodoxy," much less discrimination; Plaintiffs notably provide no explanation of how the individuals involved were "similarly situated" to Plaintiffs, or how those events are sufficiently "equivalent" to plausibly show that Harvard "acted with discriminatory intent."  *Brown Univ.*, 43 F.4th at 207-208.  Nor do Plaintiffs allege that any students were found to have violated similar policies but "received lesser punishments" than others Harvard has sanctioned in the past.  *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 224 (D. Mass. 2017).

### B.    Plaintiffs Do Not Plausibly Allege Harvard's Liability For A Hostile Educational Environment

Private Title VI plaintiffs bringing a hostile environment claim must plead "deliberate indifference to known acts of harassment" that "amount[] to an intentional violation" of the statute.  *Davis*, 526 U.S. at 643; *see Sandoval*, 532 U.S. at 279-280 (Title VI permits private suits

to "obtain both injunctive relief and damages" but "prohibits only intentional discrimination"). Plaintiffs' conclusory assertions that Harvard "had actual knowledge" of discrimination but "was deliberately indifferent to [it]" find no support in the facts alleged.  Compl. ¶ 230.

Deliberate indifference is "a stringent standard of fault" requiring proof that a university intentionally "disregarded a *known or obvious* consequence of [its] action or inaction." *Porto v. Town of Tewksbury*, 488 F.3d 67, 73 (1st Cir. 2007).  Plaintiffs must show a university's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.  Title VI therefore "does not require educational institutions to … perform flawless investigations" or "craft perfect solutions." *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 174 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009).  "[A] school will not be held liable for deliberate indifference if it takes 'timely and reasonable' measures to address the harassment." *Doe v. Emerson Coll.*, 271 F. Supp. 3d 337, 354 (D. Mass. 2017).  Plaintiffs' own allegations show Harvard's response was "not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649.

*Members 1-3 (The HKS Members**)*.  Plaintiffs' allegations relating to the HKS Members do not show Harvard intentionally discriminated against them.  As noted above, Title VI does not permit liability in private suits "based solely on principles of *respondeat superior*," *Gebser*, 524 U.S. at 283, so Plaintiffs cannot establish a Title VI violation by Harvard based on allegations that an independent investigation concluded that Professor Ganz subjected them to a hostile environment, Compl. ¶ 67; *id.* Ex. A at 22.  Plaintiffs concede they did not complain to any school official about their experience in the class until the Brandeis Center sent a letter to Dean Elmendorf on March 29, 2023, weeks after the class concluded on March 5.  *See id.* ¶¶ 52, 65.  And none of their allegations establishes that Harvard officials knew or even should have

known about the HKS Members' experience in Professor Ganz's class before receiving that letter. *Id.* ¶ 65. Harvard could not have acted with deliberate indifference to alleged harassment by Professor Ganz *before* Harvard was made aware of the HKS Members' complaints. *See Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 7 (1st Cir. 2020).

Nor can Harvard's response to the Brandeis Center's March 29 letter plausibly be characterized as intentionally discriminatory. Plaintiffs acknowledge that, once Harvard was made aware of the HKS Members' allegations, the University's immediate response was to "commission[] an external investigator to evaluate HKS' Members' claims." Compl. ¶ 66. That external investigator then spent two months looking into the allegations, including by: considering 27 different documentary exhibits; conducting interviews; and preparing a report containing preliminary findings of fact. *See id.* Ex. A at 3; Compl. ¶ 66. Then, after "consider[ing] the Parties' responses," the external investigator issued its preliminary factual findings and recommendations to the University. *Id.* Ex. A at 5.

The Complaint recites that Dean Elmendorf wrote to the HKS Members just one day later, informing them that "he had accepted a majority of the Investigative Report's findings of facts and conclusions," Compl. ¶ 75, and expressing a "need to ensure . . . that the violations of policies that occurred . . . are addressed fully and do not recur," Compl. Ex. D. He noted that "[b]ecause the allegations and findings involve complex issues of pedagogy and the rights of students and faculty members to express their views," he wished "to benefit from the counsel of faculty colleagues as [he] determine[d] next steps" and thus "conven[ed] a small group of faculty members at [HKS] to advise [him]." *Id.* Dean Elmendorf also previewed for the HKS Members that he "may not be able to give all of [them] full information about the next steps taken because some measures, such as personnel actions, may be confidential in nature." *Id.* Finally, Dean

14

Elmendorf sought to ensure that the HKS Members "ha[d] access to any supportive measures [they] might need" and connected them with another dean to assist in that effort. *Id.* Dean Elmendorf later reiterated that he "take[s] seriously [his] duty to work with [his] colleagues to prevent any recurrence of violations." Compl. Ex. F. And he explained that, although the details of personnel actions are confidential, Harvard was "taking certain personnel actions responsive to the conduct at issue" and "directed to preventing the repetition of such conduct." *Id.*

Plaintiffs thus do not allege, nor could they, that Harvard's investigation was deficient. Harvard "reacted promptly to the complaint; commenced a full-scale investigation; and pursued the investigation diligently." *Fitzgerald*, 504 F.3d at 174. "The question … is whether the investigation was *so deficient as to be unreasonable*." *Emerson*, 271 F. Supp. 3d at 355 (emphasis added). Here, as in *Emerson*, "it clearly was not." *Id.* Indeed, Harvard's "prompt commencement of an extensive investigation and its offer of suitable remedial measures distinguish this case from" those in which an educational institution takes no, or only minimal, actions in response to reported harassment and may thus be found in violation of Title VI. *Fitzgerald*, 504 F.3d at 174.

As to the remedial steps taken by Harvard, Plaintiffs assert, without support, that "neither Professor Ganz nor any of his teaching fellows suffered any personnel consequences," Compl. ¶ 80, an allegation contradicted by the Complaint's acknowledgment that personnel actions *were* taken against Professor Ganz, *id.* ¶ 79. Moreover, personnel actions are only one subset of steps that Harvard committed to taking in response to the HKS Members' complaint and to prevent any similar conduct from recurring. *See* Compl. Ex. F. Plaintiffs allege only that Harvard failed to take the exact remedial steps they wanted, with the precise level of transparency they hoped for, on the timeline they would have preferred. *See* Exhibit H. Title VI, however, "does not

require educational institutions to . . . adopt strategies advocated by [complainants]." *Fitzgerald*,

504 F.3d at 174.  Nor can Title VI plaintiffs make "particular remedial demands." *Davis*, 526

U.S. at 648.  Finally, the Complaint is devoid of any factual allegations that the HKS Members

experienced antisemitic discrimination or harassment in any setting following Harvard's actions

relating to this incident.

> **Member 4.**  Plaintiffs also cannot plausibly allege that Member 4's alleged October 18,

2023, assault occurred due to Harvard's deliberate indifference to a hostile environment or that

Harvard's response created or perpetuated a hostile environment.  As to the former, none of

Plaintiffs' allegations suggests that Harvard's responses to events preceding October 18 show

deliberate indifference to a hostile environment.  Harvard responded to the March 29, 2023,

Brandeis Center letter raising complaints about Professor Ganz by conducting an independent

investigation and taking action based on its findings.  Compl. ¶¶ 37-79.  And in contrast to the

student groups that issued a statement blaming "the Israeli regime … for all unfolding violence,"

Harvard's leadership issued multiple statements following October 7 "condemn[ing] the terrorist

atrocities perpetuated by Hamas," and emphasizing "that student groups do not speak for

Harvard University or its leadership."  *Id.* ¶¶ 86-89.

> Neither can Plaintiffs establish that Harvard intentionally discriminated by failing to take

prompt and effective action, or acting with deliberate indifference, in connection with the

October 18 incident.  Member 4 first complained to Harvard on November 13, Compl. ¶ 144,

*after* Harvard had already announced that it would allow law enforcement to complete its

announced investigation before initiating its own disciplinary process, *id.* ¶ 148.  While Plaintiffs

take issue with Harvard's decision to await the results of the law enforcement investigation, they

cannot demonstrate that doing so violated Title VI.  "[C]ourts have no roving writ to second-

guess an educational institution's choices from within a universe of plausible investigative procedures." *See Fitzgerald*, 504 F.3d at 175.  This is especially so because, as the First Circuit has previously explained, "in situations involving charges of peer-on-peer harassment, a [university] has obligations not only to the accuser but also to the accused."  *Id.* at 174.

In any event, the Complaint is filled with allegations demonstrating that Harvard's investigation into the October 18 incident is ongoing and has proceeded in parallel with the law enforcement investigation, *see* Compl. ¶¶ 151-152, 159.  Plaintiffs complain only that the investigation has not moved at the speed that they would prefer, *see id.* ¶ 153, and has not resulted in their desired disciplinary outcomes, *see id.* ¶¶ 149, 160.  But "a school satisfies its obligations if it engages in a reasonable process for investigating and addressing claims of . . . harassment."  *Emerson*, 271 F. Supp. 3d at 355-356.  Harvard has done so here.

***Remaining allegations.***  Plaintiffs' remaining allegations also fail to plausibly allege a Title VI violation.  Many involve expressive activities, including student-group statements, protests, and rallies.  *See* Compl. ¶¶ 86, 103-106, 134-135.  For example, the Complaint asserts that Member 5 saw protests and demonstrations on campus with which she disagreed and was offended by private social media posts that were not directed to her and of which Harvard was not necessarily even aware.  *Id.* ¶¶ 134-136.  Even if Plaintiffs could establish that these actions amount to severe and pervasive harassment, any decision by Harvard not to censor or punish them cannot support Title VI liability.  *See* Catherine E. Lhamon, Assistant Sec'y for Civ. Rts., U.S. Dep't of Educ., Dear Colleague Letter (May 7, 2024) ("Nothing in Title VI or regulations implementing it requires or authorizes a school to restrict any rights otherwise protected by the First Amendment."); *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1187-1188 (N.D. Cal. 2011) (dismissing Title VI claims where "a very substantial portion of the conduct to which plaintiffs

object represents pure political speech and expressive conduct").  Plaintiffs allege that other

students shouted at Member 5 on one occasion when she demonstrated in support of Israeli

hostages, that some unnamed members were subject to antisemitic vitriol at unspecified times,

and that student and faculty groups shared an antisemitic post.  Compl. ¶¶ 93-102, 137.  But they

do not allege Harvard was even aware of these statements, let alone responded unreasonably.

### C.    Plaintiffs Do Not Plausibly Allege Retaliation

Plaintiffs' Title VI retaliation claims also fail as a matter of law.  A Title VI retaliation

claim requires proof of (1) protected activity by Plaintiffs; (2) an adverse action by Harvard; and

(3) a causal connection between the two.  *Germanowski v. Harris*, 854 F.3d 68, 73 (1st Cir.

2017) (discussing retaliation under FMLA); *accord Cornelius-Millan v. Caribbean Univ., Inc.*,

2015 WL 1860831, at *4 (D.P.R. Apr. 23, 2015) (evaluating Title VI retaliation claim).  In the

context of claimed retaliation,  "activity protected by Title [VI]" means complaining to Harvard

about discrimination.  *Frazier v. Fairhaven Sch. Cmte.*, 276 F.3d 52, 67 (1st Cir. 2002).  And an

adverse action by Harvard must be one that would "dissuade[ ] a reasonable [future plaintiff]

from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v.

White*, 548 U.S. 53, 68 (2006).  These elements of Plaintiffs' prima facie case "are part of the

background against which a plausibility determination should be made."  *Germanowski*, 854

F.3d. at 71-72.  Plaintiffs accordingly must allege facts from which this Court can infer that their

complaints "triggered" or "precipitated" an adverse action.  *See id.* at 74.

Plaintiffs' entirely conclusory retaliation claims fail this standard.  Plaintiffs assert

without elaboration that members "engaged in protected activity by reporting the instances of

discrimination to Harvard officials and employees as described above" and that Harvard

"subjected [them] to material adverse actions as a result" that "occurred contemporaneously

with, or after, reports of discrimination."  *See* Compl. ¶¶ 239-240.  Plaintiffs nowhere identify

what actions they claim were materially adverse or what reports of discrimination they made. These "naked assertions" without "further factual enhancement" do not state a plausible entitlement to relief.  *Iqbal*, 556 U.S. at 678.  And to the extent Harvard can deduce the alleged factual basis for Plaintiffs' retaliation claims, they must be dismissed.

***Members 1-3 (The HKS Members)***.  The HKS Members allege no retaliatory acts by Harvard against them.  Their own narrative is that they were discriminated against by Professor Ganz because of the nature of the project they wanted to pursue and that Harvard immediately responded by investigating their claims, Compl. ¶¶ 37-79—not that Harvard acted against them after they complained about discrimination.  Even if Professor Ganz had engaged in retaliation, his conduct would not make Harvard liable because "[v]icarious liability is unavailable under Title VI."  *Ingram*, 30 F.4th at 1258.  Because Harvard can "be held liable 'only for its own misconduct,'" Plaintiffs must allege that *Harvard* retaliated against them for a protected activity. *See Bose v. Bea*, 947 F.3d 983, 994 (6th Cir. 2020) (quoting *Davis*, 526 U.S. at 640).

Even assuming that the letters sent by the Brandeis Center to Harvard on behalf of the HKS Members constitute protected activity, *see* Compl. ¶ 65, 139-140, Plaintiffs do not plausibly allege that these letters "triggered" any adverse action by Harvard, *Germanowski*, 854 F.3d at 74.  The Brandeis Center sent its first letter on March 29, 2023, more than three weeks after Professor Ganz's class ended on March 5.  Compl. ¶¶ 52, 65.  The earliest complaint to Harvard thus occurred long after the actions Plaintiffs assert were taken against them—"blocking the HKS Members' project, inviting anti-Israel speech he knew would be hurtful, and then preventing HKS Members from responding."  *Id.* ¶ 60.  Plaintiffs do not say when they received their grades, but even assuming they received "lower grades than they deserved" after March 29, *id.*, none of the alleged actions can support a retaliation claim against Harvard.  Each allegedly

was taken by Professor Ganz, not by Harvard. *Id.* And each allegedly occurred, not because of any complaint made to Harvard, but rather due to their interactions with Professor Ganz. *Id.*

**Member 4.** Any retaliation claim by Member 4 must be dismissed as well. Member 4 alleges that he was assaulted during a protest on October 18, 2023, *see* Compl. ¶¶ 111-125, and that Harvard announced that it would "address the incident through its student disciplinary procedures" once law enforcement completed its own inquiry, *id.* ¶ 148. Member 4 then filed complaints with the Law School and Divinity School on November 13 and November 15. *Id.* ¶¶ 144-145. Assuming that these complaints of "verbal harassment and physical assault" constituted protected activity under Title VI, Member 4 does not plausibly allege that they precipitated any adverse action by Harvard. In fact, Member 4 does not describe any adverse action by Harvard at all. To the extent Member 4 asserts that Harvard's decision to "await the criminal process before initiating the University disciplinary process" constituted an adverse action, that decision was made and announced on November 9, *id.* ¶ 148—before Member 4 filed his complaints, *id.* ¶¶ 144-145. Absent any facts that could allow the Court to "plausibly infer" an adverse action that "was causally related" to Member 4's complaints, his retaliation claim must be dismissed. *See Lebron v. Commonwealth of P.R.*, 770 F.3d 25, 31 (1st Cir. 2014).

**Member 5.** Member 5's retaliation claim lacks any factual basis at all. She alleges only that she "emailed Harvard administrators" on unspecified occasions to "request[] meaningful changes on campus to create a safer environment for Jewish students" but that she "decided not to move forward" with a formal complaint because she "[f]ear[ed] retaliation." Compl. ¶ 162. Even assuming these emails were protected activity, she does not allege any retaliation.

## CONCLUSION

The Court should dismiss Plaintiffs' Complaint with prejudice.

DATED:  July 22, 2024

Respectfully Submitted,

PRESIDENT AND FELLOWS OF HARVARD COLLEGE

By its attorneys,

/s/ Felicia H. Ellsworth

<table>
<tr>
<td>

Mark A. Kirsch (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
mkirsch@kslaw.com
Tel: (212) 790-5329
Fax: (212) 556-2222

</td>
<td>

Felicia H. Ellsworth, BBO #665232
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel:  (617) 526-6000
Fax: (617) 526-5000
felicia.ellsworth@wilmerhale.com

Seth P. Waxman (*pro hac vice*)
Bruce M. Berman (*pro hac vice*)
Jeremy W. Brinster (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Tel:  (202) 663-6000
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
bruce.berman@wilmerhale.com
jeremy.brinster@wilmerhale.com

</td>
</tr>
</table>