# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

The Louis D. Brandeis Center for Human Rights Under Law and Jewish Americans for Fairness in Education,

**Plaintiffs,**

v.

President and Fellows of Harvard College,

**Defendant.**

Case No. 1:24-cv-11354-RGS

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT.........................................................................................1

SUMMARY OF FACTS ................................................................................................3

ARGUMENT..............................................................................................................7

      I.       Plaintiffs have Article III standing to obtain injunctive relief.................................7

            A.     Plaintiffs allege ongoing and impending injury to student-members...............8

            B.     Plaintiffs may sue to vindicate their members' interest....................................11

      II.      Plaintiffs plausibly allege violations of Title VI.................................................12

            A.     Harvard deliberately disregards severe and pervasive antisemitism ...............12

            B.     Harvard directly discriminates against Plaintiffs' members ............................16

            C.     Plaintiffs adequately plead retaliation under Title VI .......................................20

CONCLUSION..........................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Blum v. Yaretsky,*
  457 U.S. 991 (1982) ...................................................................................................9, 10

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm.,*
  89 F.4th 46 (1st Cir. 2023) ..................................................................................................11

*Calero–Cerezo v. U.S. Dept. of Justice,*
  355 F.3d 6 (1st Cir. 2004) ..................................................................................................20

*Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.,*
  799 F.2d 6 (1st Cir. 1986) ..................................................................................................12

*Coll. of Dental Surgeons of P.R. v. Conn. Gen. Life Ins. Co.,*
  585 F.3d 33 (1st Cir. 2009) ..................................................................................................11

*Czerwienski v. Harvard Univ.,*
  666 F. Supp. 3d 49 (D. Mass. 2023) ....................................................................................20

*Dep't of Com. v. New York,*
  588 U.S. 752 (2019) ............................................................................................................10

*Doe v. Oberlin Coll.,*
  963 F.3d 580 (6th Cir. 2020) ..............................................................................................19

*Doe v. Pawtucket Sch. Dep't,*
  969 F.3d 1 (1st Cir. 2020) ..................................................................................................20

*Doe v. Purdue Univ.,*
  928 F.3d 652 (7th Cir. 2019) ........................................................................................ 16, 19

*Doe v. Univ. of Tenn.,*
  186 F. Supp. 3d 788 (M.D. Tenn. 2016) ............................................................................10

*Food & Drug Admin. v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024) ........................................................................................................7, 13

*Frankel v. Regents of Univ. of Cal.,*
  2024 WL 3811250 (C.D. Cal. Aug. 13, 2024) ......................................................................1

*Frazier v. Fairhaven Sch. Comm.,*
  276 F.3d 52 (1st Cir. 2002) ..................................................................................................20

*Frith v. Whole Foods Mkt., Inc.,*
  38 F.4th 263 (1st Cir. 2022) ................................................................................................18

*Grajales v. P.R. Ports Auth.,*
  682 F.3d 40 (1st Cir. 2012) ..................................................................................................16

*Guru Nanak Sikh Soc'y v. County of Sutter,*
  456 F.3d 978 (9th Cir. 2006) ..............................................................................................19

*Hernandez-Loring v. Universidad Metropolitana,*
  233 F.3d 49 (1st Cir. 2000) ..................................................................................................10

*Hunt v. Wash. State Apple Advert. Comm'n,*
   432 U.S. 333 (1977)..............................................................................................................7

*Jones v. Baystate Health, Inc.,*
   2022 WL 21778544 (D. Mass. Nov. 4, 2022)..........................................................16, 18, 19

*Kappa Alpha Theta Fraternity, Inc. v. Harvard Univ.,*
   397 F. Supp. 3d 97 (D. Mass. 2019) ....................................................................................7

*Kestenbaum v. President & Fellows of Harvard Coll.,*
   2024 WL 3658793 (D. Mass. Aug. 6, 2024) ................................................................*passim*

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.,*
   526 U.S. 629 (1999)............................................................................................................13

*NAACP v. Alabama ex rel. Patterson,*
   357 U.S. 449 (1958)............................................................................................................12

*Ocasio-Hernandez v. Fortuno-Burset,*
   640 F.3d 1 (1st Cir. 2011) ............................................................................................16, 19

*Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R.,*
   906 F.2d 25 (1st Cir. 1990) ................................................................................................11

*Porto v. Town of Tewksbury,*
   488 F.3d 67 (1st Cir. 2007) ................................................................................................13

*Sexual Minorities Uganda v. Lively,*
   960 F. Supp. 2d 304 (D. Mass. 2013) ................................................................................11

*StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech.,*
   2024 WL 3596916 (D. Mass. July 30, 2024) ..........................................................8, 11, 12

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
   600 U.S. 181 (2023) .........................................................................................................3, 7

*Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin,*
   37 F.4th 1078 (5th Cir. 2022) ..............................................................................................7

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.,*
   517 U.S. 544 (1996)........................................................................................................8, 12

*United States v. Hugo Key & Son, Inc.,*
   672 F. Supp. 656 (D.R.I. 1987) ..........................................................................................17

*Connor B. ex rel. Vigurs v. Patrick,*
   771 F. Supp. 2d 142 (D. Mass. 2011) ................................................................................10

*Westchester Day Sch. v. Vill. of Mamaroneck,*
   504 F.3d 338 (2d Cir. 2007) ........................................................................................19, 20

**Statutes**

42 U.S.C. § 2000d.....................................................................................................................7

**Other Authorities**

Hilary Burns, *"Our Movement Is not Going to Die Down": Pro-Palestinian Student Protesters Gear Up for Future Disruptions*, Boston Globe (June 19, 2024), https://bostonglobe.com/2024/06/19/metro/pro-palestinian-encampment-protests-campus-higher-education/ ............................................................................................................9

Statement in Support of Harvard Student Elom Tettey-Tamaklo (Dec. 5, 2023), https://medium.com/@harvardfsjp/statement-in-support-of-harvard-student-elom-tettey-tamaklo-cdb164760bf3............................................................................................................19

## PRELIMINARY STATEMENT

The facts alleged in the Complaint are so shocking that they are difficult to internalize. On Harvard's campus, in 2024, students and faculty bully, harass, intimidate, and physically assault Jewish students because they are Jewish. As a district court judge recently observed at another university plagued with similar problems: The antisemitism "is so unimaginable and so abhorrent to our constitutional guarantee of religious freedom that it bears repeating." *Frankel v. Regents of Univ. of Cal.*, 2024 WL 3811250, at *1 (C.D. Cal. Aug. 13, 2024). So Plaintiffs repeat: in 2024, Harvard students are bullied, harassed, intimidated, and assaulted because they are Jewish. And despite its promises to protect students from discrimination, Harvard disregards Jewish students' pleas for help.

Even worse, Harvard has taken *affirmative steps* to misdirect Jewish students, whitewash antisemitism, and cover up clear violations of school policy—all to protect the offenders. After receiving incontrovertible proof of anti-Jewish discrimination, Harvard obfuscates, delays, and invents bogus "policies" to prevent the Jewish students from obtaining relief. Harvard is thus violating Title VI not only through deliberate indifference to antisemitism, but also through direct discrimination against Jewish students, as it shields their harassers. Harvard is facilitating antisemitism on campus.

This vile conduct is pleaded through rock-solid allegations of fact. The Complaint describes an investigative report—that Harvard itself commissioned—finding that Jewish students were discriminated against in class, a report that Harvard formally adopted as true. The Complaint also presents multiple videos of assault on a Jewish student in broad daylight on the quad, and screenshots of Nazi-level antisemitism and threats of anti-Jewish violence run amok on internal messaging boards used by students and faculty. These well-pleaded allegations of fact are undeniable and dispositive.

Yet, just as it does to its Jewish students on campus, Harvard claims in this litigation that the entreaties from Jews must be disregarded and are not even *plausible*. Harvard argues that Jewish students have no "ongoing" injuries from discrimination—while simultaneously arguing the

Complaint should be dismissed because Harvard is addressing antisemitism. Besides being contradictory, this spurious factual defense is of no consequence on a motion to dismiss: Harvard cannot deny the well-pleaded allegations of its Jewish students that they are suffering, while patting itself on the back for protecting them. Plaintiffs allege ongoing harm to their educational experience and mental health, and describe Harvard's strategy of denying Jews relief and protecting harassers. That suffices at this stage. Harvard's argument that its response has been "not unreasonable" is again a premature question of fact. As alleged, Harvard commissioned an investigation and has made empty promises but has not held offenders accountable, and it uses public statements to cover up its inaction. As this Court found, Harvard's response to antisemitism has been "at best, indecisive, vacillating, and at times internally contradictory . . . in many instances, Harvard did not respond at all." *Kestenbaum v. President & Fellows of Harvard Coll.*, 2024 WL 3658793, at *6 (D. Mass. Aug. 6, 2024) (Stearns, J.).

This Court has already rejected most of Harvard's arguments in the related *Kestenbaum* case and should do so here. In its motion to consolidate, Harvard represented that the two cases raise "similar claims based on many of the same factual allegations against the same defendant," including the same "hostile educational environment." Dkt. No. 40, at 2-3. That the *Kestenbaum* plaintiffs sufficiently stated a deliberate indifference claim resolves Harvard's motion to dismiss that claim here. Plaintiffs' members endure the same hostile environment as the students in the *Kestenbaum* case. Likewise, the Court's ruling on associational standing equally applies. Plaintiffs' members have standing individually; moreover, associational standing is not only permissible, it is the *best* way for Jewish students to band together and vindicate their civil rights through uniform, campus-wide relief.

Finally, while the Court dismissed the direct discrimination claim in *Kestenbaum*, Plaintiffs respectfully submit that they alleged such a claim here. Harvard's independent investigation found that three of Plaintiffs' members were directly discriminated against in class; yet Harvard protected and publicly promoted the offender, while sidetracking the students' efforts at relief. Likewise, the school

sprung to action to protect students who assaulted a Jewish student, by inventing phony policies to delay and avoid having to punish one of the offenders. These allegations state a claim for direct discrimination. Such claims do not require a "comparator," as Plaintiffs allege facts that raise a reasonable inference that Harvard was motivated by antisemitism and discriminatory animus.

### SUMMARY OF FACTS

Harvard University boasts policies stating that all students are entitled to a safe and non-discriminatory learning environment. Compl. ¶ 179 (Harvard University's Non-Discrimination Policy), ¶ 183 (Harvard's Anti-Bullying Policy). But it has a history of egregious discrimination, dating back to the 1920s when it developed an admissions policy to exclude Jews and when it participated in the eugenics movement. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 257 (2023) ("*SFFA*") (Thomas, J., concurring). More recently, Harvard has discriminated against Asian-American students through its "race-based admissions programs" that "tolerate[] . . . stereotyping." *Id.* at 220 (majority op.); *id.* at 290-91 (Gorsuch, J., concurring) ("[N]o one can doubt that [Harvard] intentionally treat[s] some applicants worse than others at least in part because of their race."). As of this writing, discriminatory treatment against Jews is rampant on Harvard's campus.

For example, Member #1, Member #2, and Member #3 (the "HKS Members") were discriminated against, harassed, and humiliated during a course at the Harvard Kennedy School ("HKS"). After they proposed a project to promote democratic ideals among Israelis, Compl. ¶ 39, classmates objected, complaining the idea of a "Jewish democracy" was "offensive," ¶¶ 40-41. Professor Ganz agreed, *id.*, comparing the existence of a "Jewish state" to "white supremacy," and threatened them with "consequences," ¶¶ 44, 49, 50. When the students persisted, he retaliated by forcing them to sit through anti-Israeli diatribes from classmates and refusing to let them respond. ¶¶ 52-57. Professor Ganz also encouraged the teaching fellows to conduct a class exercise on Palestinian solidarity, ¶¶ 52-53, and the classmates later organized a class picture, in which they and

the teaching fellows wore "keffiyehs" as a symbol of Palestinian support and opposition to the HKS Members' identities, which administrators then circulated to other HKS students, ¶¶ 58-59. As was intended, the Jewish students were ostracized and could not participate in class activities.

There is no dispute regarding the facts alleged. The HKS Members objected to the discrimination, and Harvard commissioned an outside investigation (the "Investigative Report"). The Investigative Report found that Professor Ganz ran "afoul" of "principles of free speech and free exchange of ideas" when he directed the HKS Members "to change their statement of purpose and topic description" because students and teaching fellows "objected to the premise of Israel as a Jewish democracy." ¶ 68. Further, he "denigrated [HKS Members'] identities as Israelis and Jews." *Id.* And Arab and Muslim students were "[accorded] preferential treatment," because they were "viewed as a group oppressed by Israel." ¶ 71. On that basis, HKS Members were *silenced* in favor of other groups. *Id.* The Investigative Report concluded that HKS created "a hostile learning environment," denied HKS Members "a learning environment free from bias," and "denigrated" them "based on their Israeli nationality and Jewish ethnicity and ancestry." ¶¶ 68, 72. The Report also detailed the "impact" of the discrimination on the HKS Members, including stress, discomfort, and even medical issues. ¶ 73. Critically, Harvard "accept[ed] as final the [Investigative Report's] findings of fact and conclusions regarding the violations of School policies." ¶ 66. The Report, in all its lurid detail and ugly conclusions, stands as a formal admission against interest by the Defendant.

Despite accepting the Report's findings, Harvard protected and even celebrated the professor. ¶¶ 76-80. First, the University prevaricated. Citing "complex issues of pedagogy and the rights of students and faculty members to express their views," then-Dean Douglas Elmendorf explained he would wait to convene a "small group of faculty members at the School to advise [him]." ¶ 76. Dean Elmendorf represented that this process would take a few weeks, at which point he would decide what actions to take, if any. *Id.* The school took no action. After three months, Dean Elmendorf emailed

HKS Members, *again admitting to the misconduct*. ¶ 79. The Dean continued to assure HKS Members that Harvard was taking "certain personnel actions"—but stated that it could not disclose whatever action it was supposedly taking. *Id.* As of this writing, neither Professor Ganz nor his teaching fellows have faced consequences. ¶ 80. To the contrary, Harvard publicly touted Professor Ganz as a civil rights hero in the Harvard Gazette, without mentioning his recent violation of HKS Members' rights. *Id.*

This conduct preceded Hamas's terrorist attack on October 7, 2023, the deadliest day for Jews since the Holocaust. The torture, sexual violence, infanticide, and murder against Jews and others let loose on that day needs no recitation here. But life for Jews on the Harvard campus got exponentially worse from that point. On October 8, 2023, the Harvard Undergraduate Palestine Solidarity Committee ("PSC") authored a joint letter co-signed by 33 other Harvard student groups, purporting to "hold the Israeli regime entirely responsible for all unfolding violence," and stating that the "apartheid regime" in Israel is "the only one to blame." ¶ 86. The statement was shared on social media and spread around campus. *Id.* On October 9, 2023, Harvard leadership issued its first statement since the attack. ¶ 87. Instead of protecting Jewish students and denouncing the antisemitic vitriol, Leadership offered vague statements about "the war" and "violence" generally. ¶ 8. It refused to condemn the PSC letter for blaming Israel or state that antisemitism would not be tolerated. And it offered no consolation for Jewish students; it did not mention Harvard's Jewish students at all. ¶ 88.

Soon after, several student groups and a faculty group posted an antisemitic cartoon on their social media accounts. ¶ 102. The cartoon resembled Nazi-era propaganda, depicting a hand etched with a Star of David and a dollar sign holding a noose around the necks of what appear to be a black man and an Arab man. *Id.* Unsurprisingly, the following semester, on March 21, 2024, Harvard's undergraduate house Lowell House was slated to host a discussion on "Islamophobia, Antisemitism, and Religious Literacy," featuring moderator Chance Bonar, a member of Harvard Faculty and Staff for Justice in Palestine, one of the several groups that posted the antisemitic imagery. ¶ 103.

On October 18, 2023, a University-approved "Stop the genocide in Gaza" "die-in" demonstration took place on the quad—one of many subsequent protests involving rabid antisemitic and anti-Israel language, blood libel, and the calls for Israel (and the Jews within Israel) to be eradicated. ¶ 112. During this particular event, students held up signs featuring slogans accusing Israel of committing "genocide" and calling for the destruction of the Jewish state—such as "From the River to the Sea!", meaning that the land of Israel should be rid of Jews. ¶ 115.

Member #4, an Israeli Jew, was walking through campus when he encountered the demonstration and began to video the event, as others were doing. ¶ 116. When protestors identified him as Jewish and/or Israeli, they accosted him. ¶¶ 117-21. A mob surrounded him, engulfed him with keffiyehs, and chanted "Shame! Shame! Shame!" in his face. ¶¶ 122-25. The assailants grabbed him, and one hit him in the neck, forcing him out of the quad. ¶¶ 123-24. Despite irrefutable video evidence of the assault, Harvard has taken no remedial action to redress the physical attack and clear violations of its Anti-Bullying and Anti-Discrimination Policies. Instead, Harvard hid behind an ongoing criminal investigation into Member #4's assailants to avoid taking action itself, claiming that it is "standard practice" to await the criminal process. ¶ 148. There is no such policy, and there is no such standard practice. This was a lie to protect the students who assaulted Jews. ¶ 149.

The severe and pervasive antisemitism at Harvard—and Harvard's toleration, inaction, and efforts to protect the worst offenders—has affected Plaintiffs' members and other Jewish students. It has taken a mental, physical, and emotional toll, and it has severely detracted from their educational experience. ¶¶ 166-71. Member #5 does not even feel safe commuting to the Longwood laboratory and works remotely, missing out on valuable experiences. ¶¶ 133-38. The students and Plaintiffs have sent letters and filed complaints with the University, trying to improve the situation at Harvard. ¶¶ 139-46. But Harvard has not publicly apologized for discriminating against HKS Members, it has not fired or suspended the professor or disciplined the teaching fellows, it has not announced suspensions or

expulsions of Member #4's attackers, and it has not provided training to prevent antisemitism or anti-Israel bias in the future. To the contrary, Harvard has taken affirmative steps to protect the antisemitic offenders and to paper over clear violations of school policies. ¶¶ 78, 80, 160, 162.

## ARGUMENT

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d ("Title VI"). Harvard does not dispute (because it cannot) that Title VI protects Jews from discrimination based on their "actual or perceived" shared ancestry or ethnic characteristics. *Kestenbaum*, 2024 WL 3658793, at *5.

## I. Plaintiffs have Article III standing to obtain injunctive relief

Plaintiffs are associations that seek injunctive relief to vindicate the civil rights of their student-members. Contrary to Harvard's arguments, this is permissible. Numerous courts have upheld the standing of student associations to challenge unconstitutional or unlawful university policies and practices—including in other cases against Harvard. *See, e.g.*, *SFFA*, 600 U.S. at 199-201; *Kappa Alpha Theta Fraternity, Inc. v. Harvard Univ.*, 397 F. Supp. 3d 97, 105 (D. Mass. 2019); *Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1084 (5th Cir. 2022).[1]

In general, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert.*

---

[1] While Plaintiffs rely mainly on associational standing, the Brandeis Center has organizational standing because Harvard has "perceptibly impaired [the Brandeis Center's] ability to provide counseling" to other students, limiting its bandwidth, thus "directly affect[ing] and interfer[ing]" with one of its "core" activities. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). The Court need not reach the question of organizational standing, as associational standing suffices to sustain Plaintiffs' claims.

*Comm'n,* 432 U.S. 333, 343 (1977). While the first two prongs of this test are jurisdictional, "the associational standing test's third prong is a prudential one." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.,* 517 U.S. 544, 555 (1996).

Harvard does not dispute the second prong. It argues that Plaintiffs cannot satisfy the first prong, claiming they do not allege that their members have standing in their own right; and it argues that the third, prudential prong demands dismissal because the suit will require too much individualized participation by Plaintiffs' members. Mot. 7-10. Neither argument has merit. This Court recently rejected identical arguments in the related *Kestenbaum* case and another similar lawsuit. *See Kestenbaum,* 2024 WL 3658793, at *3-4; *StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech.,* 2024 WL 3596916, at *3-4 (D. Mass. July 30, 2024) (Stearns, J.). It should do the same here.

### A.    Plaintiffs allege ongoing and impending injury to student-members

On campus and in court, Harvard turns a deaf ear to the pleas of its Jewish students. Harvard argues that none of Plaintiffs' members has standing individually because "the Complaint does not demonstrate that Plaintiffs' members face an ongoing or 'certainly impending' future injury traceable to Harvard." Mot. 8. Harvard's argument that it is not even *plausible* that Plaintiffs' members are suffering ongoing injury because of Harvard's conduct is as bewildering as it is dismissive of the ongoing pain that the students are enduring. The Complaint contains allegation after allegation of Harvard's discriminatory and deliberately indifferent actions—all of which have created a hostile environment and culture of discrimination that *currently* prevails on campus. *See supra* pp.3-7.

Take one example: After many on its campus responded to October 7, 2023 by celebrating Hamas, Compl. ¶¶ 86, 102, Harvard allowed agitators to host a "Stop the genocide in Gaza" "die-in" on the quad of Harvard's business school campus. *Id.* ¶ 112. Predictably, this event featured the usual potpourri of antisemitic invective and incitement. *Id.* ¶¶ 113-15. And when attendees—in actions documented on video and reported by news outlets actions across the country—harassed and then

assaulted an Israeli Jewish student who dared document their hate, Harvard made excuses. *Id.* ¶¶ 115-27. In direct contravention of its own policies, it refused (and continues to refuse) to take any public and final remedial action against the perpetrators—even after they have been criminally charged. *Id.* ¶¶ 144-61. Every day that goes by is another one that Harvard makes clear to its Jewish and Israeli students that they are not welcome. *Id.* ¶¶ 166-71. These students' views about Israel, and the Jewish stars or yarmulkes that they wear on their person, make them a target for the antisemitic faculty and students who know the school will protect them from punishment. These allegations and others suffice at the pleading stage to plausibly show "ongoing injury or a sufficient threat that the injury will recur." *Kestenbaum*, 2024 WL 3658793, at *3 (quoting *Roe v. Healey*, 78 F.4th 11, 21 (1st Cir. 2023)).

Harvard also does not (and cannot) claim that the hostile environment will soon go away. At the July 24 oral argument in *Kestenbaum*, Harvard's counsel admitted that the school could not make such a promise. Hr'g Tr. 7:21-23, *Kestenbaum et al v. President & Fellows of Harvard Coll.*, No. 24-10092 (D. Mass. July 24, 2024), Dkt. No. 90. For good reason: the antisemitic agitators are "gearing up for another intense season of activism in the fall." Hilary Burns, *"Our Movement Is not Going to Die Down": Pro-Palestinian Student Protesters Gear Up for Future Disruptions*, Boston Globe (June 19, 2024).[2]

Given Harvard's longstanding and consistent habit of disregarding antisemitism on campus, there is no reason to believe that next semester will be any better for Jewish students—to the contrary, Harvard has invited rampant antisemitism through its pattern and practice of condoning antisemitism, and its repeated refusal to enforce university policies to antisemitic wrongdoers. Even if it were not obvious that the problem is ongoing, the past conduct alone would suffice for Article III standing, given its consistency. *See* Compl. ¶¶ 87-91, 139-65; *see also Blum v. Yaretsky*, 457 U.S. 991, 1001 (1982) ("[P]ast wrongs are evidence bearing on whether there is real and immediate threat of repeated

---

[2]     https://bostonglobe.com/2024/06/19/metro/pro-palestinian-encampment-protests-campus-higher-education/.

injury."). Plaintiffs thus have standing to ask this Court to enjoin Harvard from deploying the same discriminatory and deliberately indifferent playbook when classes begin in September. *See id.* at 1000-01 (holding plaintiffs had standing to seek prospective relief regarding nursing homes' flawed decision-making practices "[i]n light of similar determinations already made by the committee of physicians chosen by the facilities to make such assessments"); *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 153 (D. Mass. 2011) ("Plaintiffs have standing to" to challenge "policies and practices that continue to harm them"); *Doe v. Univ. of Tenn.*, 186 F. Supp. 3d 788, 813 (M.D. Tenn. 2016).

Harvard argues that Plaintiffs' allegations fail to establish a "connection between Harvard's response to the incidents [Plaintiffs] identify and any possible ongoing or future harm." Mot. 9. In support, Harvard cites generally to thirteen exhibits and a declaration that purportedly demonstrate the sufficiency of Harvard's response to antisemitism on campus. *See* Mot. 10. Harvard is incorrect. Such fact-based arguments have no business appearing in a motion to dismiss a Complaint: The Complaint describes the effects that Harvard's discrimination and deliberate indifference have had on Plaintiffs' members, *see* Compl. ¶¶ 166-72. This is more than sufficient to show a "fairly traceable" connection between those injuries and Harvard's actions and indifference, *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019). Standing requires nothing more. *See id.* at 768 ("Article III 'requires no more than de facto causality.'"); *Connor B.*, 771 F. Supp. 2d at 152 (providing that even an "indirect[]" connection suffices to establish traceability).[3] Harvard, like all those accused of civil rights violations, cannot escape scrutiny or deny victims standing by promising or claiming to fix the problem—especially at the pleading stage. Harvard's supposed guarantee to "take [actions] to deter and prevent antisemitic harassment," Mot. 10, can be asserted as a factual defense down the road, but is not

---

[3] Harvard is wrong to suggest this Court cannot consider allegations unless "Plaintiffs' members experienced them" personally. Mot. 10; *see, e.g.*, *Hernandez-Loring v. Universidad Metropolitana*, 233 F.3d 49, 55 n.4 (1st Cir. 2000) ("Evidence of the harassment of third parties can help to prove a legally cognizable claim of a hostile environment.").

appropriate in a motion to dismiss. In any event it does not withstand scrutiny in light of the Complaint's allegations chronicling Harvard's record of deliberate indifference and empty promises, and Plaintiff is entitled to all inferences being drawn in its favor.

As this Court recognized in *Kestenbaum*, Harvard's traceability arguments go to the "core merits dispute in this case," *i.e.*, "whether Harvard's actions to date have been adequate and whether they will likely be effective going forward." 2024 WL 3658793, at *4. Like it did in *Kestenbaum*, this Court should not consider Harvard's evidentiary submissions, "decline[] to rule on the issue at this formative stage of the litigation," and deny Harvard's motion. *Id.* (citation omitted); *see also StandWithUs*, 2024 WL 3596916, at *4 (rejecting a similar jurisdictional challenge for the same reason).

**B.    Plaintiffs may sue to vindicate their members' interest**

In a single paragraph, and with little explanation, Harvard argues that claims arising from incidents of discrimination and a hostile environment are too "individualized" to permit Plaintiffs to seek injunctive relief on behalf of their members. Mot. 7. Yet this Court has already concluded that Harvard's position takes too narrow a view of *Hunt*'s third, prudential prong. *See Kestenbaum*, 2024 WL 3658793, at *4; *StandWithUs*, 2024 WL 3596916, at *4.

The First Circuit and courts in this district have consistently held that associations may sue "on behalf of its members in a case (like this one) that seeks . . . injunctive or declaratory relief" applicable to all members, *Coll. of Dental Surgeons of P.R. v. Conn. Gen. Life Ins. Co.*, 585 F.3d 33, 40 (1st Cir. 2009), even if the "requested remedy would certainly require some factual showing that [members] . . . have been" affected by the defendant's conduct, *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm.*, 89 F.4th 46, 55 (1st Cir. 2023). *See also Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R.*, 906 F.2d 25, 35-36 (1st Cir. 1990); *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 324, 327 (D. Mass. 2013). Therefore, even if "Title VI claims are 'necessarily individualized,'" "this does not preclude associational standing because the requested relief will 'inure to the benefit of those members of the

11

association actually injured.'" *Kestenbaum*, 2024 WL 3658793, at *4 (quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)); *see also StandWithUs*, 2024 WL 3596916, at *3 ("Even if [Plaintiff's] claims require 'proof specific to individual members of the association,' this is no bar to associational standing for purposes of injunctive relief." (quoting *Playboy Enters.*, 906 F.2d at 35)).

This case does not present the pitfalls that *Hunt*'s "prudential" third prong guards against. *United Food*, 517 U.S. at 555-56. Harvard does not question that Plaintiffs will pursue this case with "adversarial intensity." *Id.* at 556. And because Plaintiffs do not seek damages, there is no "hazard of [reaching] the damages stage only to find the plaintiff lacking detailed records or the evidence necessary to show the harm with sufficient specificity," nor "risk that the damages recovered by the association will fail to find their way into the pockets of the members on whose behalf injury is claimed." *Id.* To the contrary, Plaintiffs seek uniform, campus-wide relief that would benefit all members—making this the textbook case for associational standing: "Actions for declaratory, injunctive and other forms of prospective relief have generally been held particularly suited to group representation." *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986). Just like black Americans did during the civil rights movement, *see, e.g.*, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459 (1958), Jewish and Israeli students may band together to fight discrimination through an association that will obtain relief that benefits them all. Although Harvard applies different standards when it comes to different groups, the law does not. Plaintiffs' members do not have to take their turn one at a time and let Harvard try to pick them off one by one.

## II.   Plaintiffs plausibly allege violations of Title VI

### A.   Harvard deliberately disregards severe and pervasive antisemitism

A claim for deliberate indifference has five elements: (1) plaintiffs were "subject to 'severe, pervasive, and objectively offensive' . . . harassment"; (2) the harassment "caused the plaintiff to be deprived of educational opportunities or benefits"; (3) the school "knew of the harassment"; (4) the

harassment occurred "in its programs or activities"; and (5) the school "was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances." *Porto v. Town of Tewksbury*, 488 F.3d 67, 72-73 (1st Cir. 2007). Harvard contends that the Complaint fails to allege the first and fifth elements. Mot. 12-18. Harvard is wrong.

At the outset, Harvard's motion misconstrues Plaintiffs' hostile environment claim by trying to isolate individual events that are representative of the larger environment. *See* Mot. 12-18. But Plaintiffs are suing on behalf of *all* members, based on the "constellation" of circumstances that create the hostile environment. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999). While Harvard focuses on the discrimination in Professor Ganz's class and the physical assault at a protest, it ignores many other allegations of hostility—the pervasive calls to destroy Israel, the Nazi-level propaganda, and threats of anti-Jewish violence on message boards. *See supra* pp.3-7. Harvard's failure to acknowledge the full panoply of antisemitic hostility, alone, defeats its argument.

In any event, the Court's *Kestenbaum* order upholding the Title VI deliberate indifference claim precludes Harvard's argument. This Court explained that:

> [P]laintiffs have plausibly pled that they were subject to severe, pervasive, and objectively offensive harassment. . . The protests were, at times, confrontational and physically violent, and plaintiffs legitimately fear their repetition. The harassment also impacted plaintiffs' life experience at Harvard; they dreaded walking through the campus, missed classes, and stopped participating in extracurricular events.

*Kestenbaum*, 2024 WL 3658793, at *5. Plaintiffs' members experienced the same pervasive and vicious harassment, at many of the same protests, and they endured the same legitimate fear of repetition and deleterious effect on their education. Compl. ¶¶ 133-38. Harvard's defense is hamstrung by its own admission that these cases have substantial "factual overlap," including with regard to hostile environment. *See* Dkt. No. 40, at 3. That makes sense because Jewish students on the same campus necessarily experience the same "environment"—*i.e.*, the vicious antisemitic protests on a regular basis, the ostracization, the mistreatment by professors, and the expectation that pro-Israel stances

will not be tolerated. And, as Harvard notes, the *Kestenbaum* complaint specifically refers to and incorporates the experiences of Brandeis Center and JAFE members as "bases for Title VI liability." Dkt. No. 40, at 3. As those allegations supported a Title VI claim there, they do so here too.

Harvard is also wrong with respect to the individual events, which are illustrative of a hostile environment. For one, Harvard's argument about Professor Ganz's class is a non-starter in light of its Investigate Report, which found a discriminatory and hostile environment in class, *and which Harvard adopted as true*. Harvard cannot unring the bell by ignoring its prior binding admissions. Harvard also has video evidence of physical assault and Nazi-level antisemitic posts on internal chats that threaten Jews with harm. *See supra* pp.3-7. If that does not constitute a hostile environment, nothing does.

As to the fifth element (*i.e.*, deliberate indifference), Harvard argues that "any decision by Harvard not to censor or punish [severe and pervasive harassment] cannot support Title VI liability." Mot. 17. But this Court was correctly "dubious that Harvard can hide behind the First Amendment to justify avoidance of its Title VI obligations." *Kestenbaum*, 2024 WL 3658793, at *6. Harvard is not Congress or the government; it is a private institution. *Id.* at *6. Likely for that reason, Harvard has not felt compelled to adhere to First Amendment principles when taking actions against professors or students for speech with which the University does not agree. *See, e.g.*, Compl. ¶ 164.

Indeed, the facts in the Complaint make it impossible for Harvard to marshal a First Amendment argument in its defense. The Investigative Report found that Professor Ganz ran "afoul" of HKS's own "principles of free speech and free exchange of ideas" when he directed the HKS Members "to change their statement of purpose and topic description" because other students and teaching fellows "objected to the premise of Israel as a Jewish democracy." *Id.* ¶ 68. It further found that HKS Members were *silenced* in favor of other groups because their speech was deemed too "offensive." *Id.* ¶¶ 41, 68, 71. Harvard then did nothing to protect the free speech and viewpoints of Jewish students. Its use of the First Amendment in its own defense cannot be taken seriously.

While Harvard is not a governmental institution subject to the First Amendment, it accepts funding from the federal government on the condition that it adhere to Title VI. Compl. ¶¶ 14, 27. Harvard has utterly failed to meet its legal obligations. As this Court recognized, Harvard's response to antisemitism on campus has been "at best, indecisive, vacillating, and at times internally contradictory. . . . [I]n many instances, Harvard did not respond at all." *Kestenbaum*, 2024 WL 3658793, at *6. For the reasons above, the conclusion that Harvard has been deliberately indifferent to its own antisemitic hostile educational environment, writ large, applies equally to Plaintiffs' members. *Supra* pp.13-14. If there were any doubt, Plaintiffs allege that Harvard did nothing to remedy the undisputed discrimination or to punish Professor Ganz—who it instead chose to celebrate as a civil rights hero. Compl. ¶ 80. And Harvard has done nothing to punish the students who physically assaulted a student at a protest despite video proof. *Id.* ¶ 148. That is the epitome of deliberate indifference—having knowledge (and factual findings) of antisemitic harassment and doing nothing.

Harvard argues that it has taken steps to remedy the discrimination against the HKS students and the student physically assaulted for being Jewish, and that its steps are not clearly unreasonable. But Harvard misrepresents Plaintiffs' allegations and evades the main point—that taking "steps" or "investigating" means nothing at all if there is no actual accountability for offenders. For example, Harvard argues that Plaintiffs "acknowledg[e] that personnel actions *were* taken against Professor Ganz." Mot. 14 (citing Compl. ¶ 79). That is simply false. Plaintiffs allege that Harvard sent an email *representing* to the "HKS Members that Harvard was taking 'certain personnel actions'" but that any actions "*could not be disclosed.*" Compl. ¶ 79 (emphasis added). In other words, Harvard did not actually take action; it was stringing the HKS students along with empty promises and covering up for Professor Ganz. And the school later lionized Professor Ganz as a civil rights icon, even *after* accepting the undisputed findings that he discriminated against Jewish-Israeli students. *Id.* ¶ 80. Harvard's empty promises and statements are not enough. As this Court held, Harvard may not evade Title VI

responsibility by citing "virtuous public declarations that for the most part . . . proved hollow when it came to taking disciplinary measures against offending students and faculty." *Kestenbaum*, 2024 WL 3658793, at *6. "In other words, the facts as pled show that Harvard failed its Jewish students." *Id.*

### B.   Harvard directly discriminates against Plaintiffs' members

Plaintiffs plausibly allege that Harvard directly discriminated against Jewish and Israeli students. To allege direct discrimination at the pleading stage, a student need only raise a "plausible inference" that he was denied educational benefits because of his race or national origin. *Doe v. Purdue Univ.*, 928 F.3d 652, 670 (7th Cir. 2019); *Jones v. Baystate Health, Inc.*, 2022 WL 21778544, at *6 (D. Mass. Nov. 4, 2022). "'Smoking gun' proof of discrimination is rarely available, especially at the pleading stage." *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 49 (1st Cir. 2012). Thus, Plaintiffs need only "raise a reasonable expectation that discovery will reveal evidence" of the alleged direct discrimination. *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 17 (1st Cir. 2011).

Plaintiffs here raise a reasonable inference of direct discrimination because, not only was Harvard indifferent to the pleas of Jewish students, it took affirmative steps to cover up the incidents and protect the offenders. Harvard's leadership drafted and sent emails to Jewish students and made public statements—not only with the intent to evade responsibility, but also with the intent to distract and divert Jewish students from obtaining any relief and creating any problems for the administration. To that end, Harvard intentionally protected students and faculty with antisemitic and anti-Israel views, notwithstanding that they violated school policies and harmed Jewish students via their actions.

For example, despite clear video evidence of a physical assault against a Jewish student, Harvard refused to take any disciplinary action against the offender. But it did more than that. It invented a bogus excuse to protect the offender and ensure he would evade punishment from the school. After the assault, Harvard claimed it would await the "criminal process," as local authorities were investigating. Compl. ¶¶ 11, 149. But Harvard's excuse was non-sensical. The school punishes

non-criminal offenders all the time. *Id.* ¶ 149. It makes no sense to treat a violator of school rules *more favorably* when his conduct potentially rose to the level of criminality—particularly when the school had video evidence that the offender violated Harvard's Anti-Bullying Policy. *Id.* ¶¶ 111, 118, 183.

It is reasonable to infer at this stage that Harvard's desire to await the "end" of criminal process was an intentional scheme to protect the offender. Criminal investigations typically do not have formal "endings" if there is no indictment or charge, and police authorities typically do not announce the end of such a criminal investigation publicly. *See United States v. Hugo Key & Son, Inc.*, 672 F. Supp. 656, 659 (D.R.I. 1987) ("While any criminal proceedings that may result from [a] criminal investigation would have a definite and final conclusion, a criminal investigation from which no indictment issued would not have a natural and necessary terminus."). Thus, it is plausible that, at that time it made its announcement, Harvard believed it could keep the victim quiet by inventing a "standard practice" that deflected any responsibility. Notably, the antisemitic offender *was* ultimately charged in May of this year, yet Harvard still has not taken any disciplinary action. Compl. ¶ 159.

The same is true for its treatment of the HKS Members. Harvard did not merely fail to take action to discipline the professor who discriminated against Jewish and Israeli students; the Dean sent the students emails that obfuscated, delayed, and again referred to bogus "policies" and practices. First, the Dean delayed months, even though he promised a response after only a few weeks. Compl. ¶¶ 76-78. Then, he purported to convene a group of faculty to discuss "complex issues of pedagogy"—even though "pedagogy" was entirely irrelevant: the Investigative Report *had already found* the professor directly discriminated against the students *without any pedagogical basis to do so* (a finding that the school adopted). *Id.* ¶¶ 67-68, 75-76. Finally, the Dean misled the students, stating that whatever the school ultimately decided to do, its personnel decisions must remain "confidential" under school rules. But many Harvard personnel decisions are made public. *Id.* ¶¶ 79, 164.

At this stage, these allegations raise a reasonable inference that Harvard, in multiple instances,

directly discriminated against Plaintiffs' members based on their shared ancestry and/or national origin by taking affirmative steps to obfuscate, mislead, and deter them from seeking relief. In *Thompson v. Ohio State University*, for example, a student alleged a professor discriminated against her on the basis of race. 990 F. Supp. 2d 801, 817 (S.D. Ohio 2014). The plaintiff further alleged that in response to his complaint, the school conducted only a superficial investigation, failed to take action to remedy the discrimination, *and* took active steps to cover up discrimination. *Id.* The court held that the allegation that the school "'actively participated' in intentionally discriminatory conduct because the University[] w[as] motivated by discriminatory animus in their 'official action' taken against Plaintiff" was sufficient to allege the "requisite discriminatory intent required for a Title VI claim." *Id.* at 816-17. So too here. Plaintiffs are therefore entitled to discovery to probe the reasoning and motivation behind the school's affirmative conduct and cover-ups, and determine whether the emails and statements were intentionally misleading.

Nor is this a *respondeat superior* claim, as Harvard suggests in order to avoid accountability and place the blame on others. Mot. 11. For the reasons above, the reasonable inference of intentional discrimination arises from *Harvard*'s own conduct *after* receiving dispositive evidence of discrimination, not just the conduct of the offending individuals like Professor Ganz.

Notably, Plaintiffs are able to survive the pleading stage without a "comparator": "Although comparator evidence may provide powerful support for a claim of disparate treatment, the existence of a similarly situated [student] is not a required element of a Title VII discrimination claim." *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 274 n.10 (1st Cir. 2022). Comparators are only one way of pleading direct discrimination. But discrimination may also be shown by "establishing that the defendant acted with 'animus or stereotyped thinking or other forms of less conscious bias.'" *Jones*, 2022 WL 21778544, at *6 (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 980 F.3d 157, 196 (1st Cir. 2020)). Particularly when pleading "'a protean issue such as an actor's motive or intent,'"

"telltale clues may be gathered from the circumstances surrounding the alleged discriminatory action." *Id.* (quoting *Grajales*, 682 F.3d at 49). Here, even without a comparator, Harvard's discriminatory intent can be inferred through its actions. These allegations suffice to "'unlock the doors of discovery.'" *Ocasio-Hernandez*, 640 F.3d at 19 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In other civil rights contexts, courts recognize that arbitrary application of policies alone—like Harvard's here—can establish discriminatory intent. *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 350 (2d Cir. 2007) ("The arbitrary application of laws to religious organizations may reflect bias or discrimination against religion."); *Guru Nanak Sikh Soc'y v. County of Sutter*, 456 F.3d 978, 990-91 (9th Cir. 2006) (finding civil rights violation where county "inconsistently applied" law and disregarded findings "without explanation."). An erroneous decision maybe actionable if it is "inexplicable," *Doe v. Oberlin Coll.*, 963 F.3d 580, 588 (6th Cir. 2020), or "perplexing," *Purdue Univ.*, 928 F.3d at 669, as are the "policies" that Harvard invokes when it receives complaints from Jews—policies that always protect the offender and never help the Jewish student.

It is also plausible to infer that Harvard is kowtowing to the large number of faculty who do hold deeply antisemitic and anti-Israel views, and that it is discriminating against Jews to appease those faculty members. *See, e.g.*, Compl. ¶ 136 (citing professors' antisemitic tweets). After one of Plaintiffs' members was assaulted at a protest, faculty and staff banded together to call for protection of the *assaulter*, and blamed the victim because his (Jewish) presence made the protestors feel "unsafe" and "frighten[ed]." Harvard Faculty and Staff for Justice in Palestine, Statement in Support of Harvard Student Elom Tettey-Tamaklo (Dec. 5, 2023).[4] The faculty and staff called for the assaulter's protection because of "dark skin," notwithstanding that he assaulted another student. *Id.* And, again, this is not a *respondent superior* argument: Harvard caving in to the loud voices of discriminatory faculty

---

[4]       https://medium.com/@harvardfsjp/statement-in-support-of-harvard-student-elom-tettey-tamaklo-cdb164760bf3

raises a plausible inference that Harvard itself acts with discriminatory intent. *See Westchester Day Sch.*, 504 F.3d at 346, 354 (finding a civil rights violation where the local zoning board disregarded objective criteria and evidence and deferred to the objections of a "small but influential" group).

### C. Plaintiffs adequately plead retaliation under Title VI

To plead retaliation, plaintiffs must show: (1) protected activity by the plaintiffs; (2) knowledge by the defendant of the protected activity; (3) an adverse school-related action; and (4) a causal connection. *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002).

Harvard argues that Plaintiffs fail to allege retaliatory conduct in response to their complaints. Mot. 18-19. But Plaintiffs allege that, after complaining to Professor Ganz, he threatened them, forced them to listen to classmates' anti-Israeli diatribes, refused to let them respond, and gave them unjustifiably low grades. *See* Compl. ¶¶ 3, 49, 52-57, 60-63. Harvard also argues that Professor Ganz's retaliatory conduct cannot be imputed to Harvard. Mot. 19. But universities are liable when they know of but fail to address discriminatory or retaliatory actions by faculty. *See Czerwienski v. Harvard Univ.*, 666 F. Supp. 3d 49, 91 (D. Mass. 2023); *Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 11 (1st Cir. 2020).

Finally, Harvard argues that Plaintiffs fail to allege causation. Mot. 19. Specifically, it argues that the HKS Members did not engage in protected activity until the Brandeis Center sent a letter to Harvard, so there is no proximate cause. Mot. 19-20. Not so. The HKS Members complained of Professor Ganz's unfair treatment in a February 27, 2023 meeting and repeatedly thereafter, before the letter was sent, both to Professor Ganz and his teaching fellow. *See* Compl. ¶¶ 3, 41-57, 60-63. Thus, Plaintiffs sufficiently allege temporal proximity to establish causation. *See Calero–Cerezo v. U.S. Dept. of Justice*, 355 F.3d 6, 25-26 (1st Cir. 2004).

## CONCLUSION

For the foregoing reasons, the Court should deny Harvard's Motion to Dismiss.

August 30, 2024
Boston, Massachusetts

Respectfully Submitted,

*/s/ Jonathan D. Polkes*

Kenneth L. Marcus (*pro hac vice*)
L. Rachel Lerman (*pro hac vice*)
**THE LOUIS D. BRANDEIS CENTER
FOR HUMAN RIGHTS UNDER LAW**
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006
Tel: (202) 559-9296
klmarcus@brandeiscenter.com
rlerman@brandeiscenter.com

Jason Torchinsky (*pro hac vice*)
Jonathan Lienhard (*pro hac vice*)
John Cycon (*pro hac vice*)
Erielle Davidson (*pro hac vice*)
**HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC**
2300 N Street NW, Suite 643A
Washington, DC 20037
Tel: (202) 737-8808
jtorchinsky@holtzmanvogel.com
jlienhard@holtzmanvogel.com
jcycon@holtzmanvogel.com
edavidson@holtzmanvogel.com

Mohammad O. Jazil (*pro hac vice*)
**HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC**
119 S. Monroe Street, Ste 500
Tallahassee, Florida 32301
Tel: (850) 270-5938
mjazil@holtzmanvogel.com

Jonathan Vogel (*pro hac vice*)
**VOGEL LAW FIRM PLLC**
6000 Fairview Road
South Park Towers, Suite 1200
Charlotte, North Carolina 28210
Tel: (704) 552-3750
jonathan.vogel@vogelpllc.com

Jonathan D. Polkes (*pro hac vice*)
Jared R. Friedmann (*pro hac vice*)
Rebecca Sivitz (BBO # 684347)
Shai Berman (*pro hac vice* forthcoming)
Daniel M. Lifton (*pro hac vice* forthcoming)
Milana Bretgoltz (*pro hac vice* forthcoming)
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Jonathan.Polkes@weil.com
Jared.Friedmann@weil.com
Rebecca.Sivitz@weil.com
Shai.Berman@weil.com
Daniel.Lifton@weil.com
Milana.Bretgoltz@weil.com

Mark Pinkert (*pro hac vice*)
Alli G. Katzen (*pro hac vice* forthcoming)
**WEIL GOTSHAL & MANGES LLP**
1395 Brickell Avenue, Ste #1200
Miami, FL 33131
Tel: 305-577-3163
Mark.Pinkert@weil.com
Alli.Katzen@weil.com

Douglas Brooks (BBO #636697)
**LIBBY HOOPES BROOKS & MULVEY
P.C.**
260 Franklin Street, Suite 1920
Boston, Massachusetts 02110
Tel: (617) 338-9300
dbrooks@lhbmlegal.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2024, I caused this document to be filed through the CM/ECF system, where it will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Jonathan D. Polkes*
Jonathan D. Polkes (*pro hac vice*)